Majority Report oe Committee on Privileges and Elections.
Assembly Chamber, April 22, 1869.
By unanimous consent, Mr. Hegeman, from the committee on privileges and elections, submitted a report on the contested seat of Mr. Halpine, as follows:
Report oe the Committee on Privileges and Elections in the MATTER OE THE ELECTION OE Wm. IÍALPINE, AS MEMBER OE ASSEMBLY erom the Thirteenth Assembly District, contested by Alexander McLeod.

To the Assembly:

The standing committee on privileges and elections, to whom was referred the petition of Alexander McLeod, claiming the seat as member of Assembly, from the thirteenth Assembly district, in the city and county of Hew Y orle, now occupied by Wm. Halpine, respectfully report:
That, owing to the large number of witnesses, the difficulty, as well as the expense of procuring their attendance at the Capitol, the nature of the record proofs, which could not be withdrawn from the county clerk’s office of the county of Hew York, to which 'constant access was necessary, compelled your committee to conduct the investigation in this case in the city of Hew York, and that, during the progress of this protracted examination, both the contestant and incumbent were in attendance, personally, and by able and experienced counsel.
The Assembly district in question is the thirteenth of the city of Hew York, embracing nearly all the sixteenth ward.
The intense, interest manifested by the press and the partisan *440 friends of the parties to tbe contest, was seen in tbe large attendance at tbe sittings of your committee.
Tbe investigation, as it progressed, developed the cause of this wide-felt interest, and showed that the sixteenth ward of the city was the chief center.from which the election frauds of the city and county radiated. Judge John Ií. McCunn of the superior court of the city, 'and his brother-in-law, clerk of the above court, reside in this ward from which so many reputed fraudulent naturalization papers were issued during the canvass of the last general election. In this ward, also, lives the notorious Henry Lile, a self-condemned fraudulent naturalization broker, the notorious Peter Burke, Patrick McCaffrey, Scip and Bosenberg; It is here, too, that the “ Nineteenth street gang ” of bruisers and “ repeaters ” have their head-quarters, together with the naturalization mills of McMann,- Beglan an Scip.
The duty owed to the people of this State, the'question of the purity of the ballot-box, and the necessity of further safeguards for its protection, justice to the parties in the case, all demanded that ■your committee should give to this contest the most thorough examination consistent with their other duties as members of this House.
The inability of the contestant to procure official documents on file in the office of the county clerk, the board of supervisors, and other places where election records are kept, induced him to'abandon all other points and specifications, and to confine himself to the three following:
1st. The exclusion and disallowance of the vote in the seventeenth election district of this Assembly district, on the ground that , there was no canvass of the votes in that district; that the number of ballots were estimated — guessed at — not counted, and that there were other informalities and irregularities.
2d. That the incumbent had cast and counted for him a large number of illegal ballots, by a class of persons known as “ repeaters,” whereby several hundred illegal ballots were allowed him in the official canvass and estimate of the votes cast.
3d. That the incumbent had cast for him and counted a large number of illegal ballots by persons voting and repeating on fraudulent naturalization papers, whereby several hundred illegal ballots were allowed him in the official canvass and estimate of the votes cast.
To give a clear idea of the sufficiency of the evidence by which the contestant has sought to establish the grounds upon which he claims his seat, it must be observed that there were three candidates *441 nominated and voted for in the district, viz., ¥m. Halpine (Tammany democrat), Asbael K. Herrick (union democrat), and Alexander McLeod (republican).
The canvassers awarded Mr. Halpine-.. 2> 921
(í “ McLeod. 2,731
“ “ Herrick. 1,068
Scattering, blank and defective..'. 101
Thus giving to the sitting member over the contestant a plurality of one hundred and ninety votes.
It was, therefore, necessary that the contestant should show, under the three points named, that the sitting member should be disallowed more than that number of votes awarded him by the official canvass.
At the time the canvass was made, a democratic canvasser of the seventeenth district had a bet or wager pending in the interest of the incumbent to the amount of $500, deposited in the hands of a stakeholder upon the result in said seventeenth district. That this canvasser, uniting with the other canvassers in assorting the Assembly ballots after they were taken from the box, placed such as he pleased on a certain file or wire appointed for Mr. Halpine’s votes, and the others he placed, or assisted in placing, on the wires designated for the ballots of the other candidates, McLeod and Herriclc'respectively.
After this he assisted in counting McLeod’ and Herrick’s ballots, which he added together, and the sum of their ballots was then sxxb-tracted from the whole number of ballots cast, and the remainder allowed to Mr. Halpine, without counting them; thus was every rule or requirement of canvassing votes disregarded; for,
1st. Mr. Halpine was allowed the benefit of “ blanks, defective and scattering ballots, of which there was a large number cast. •
2d. The associate canvasser never examined the ballots, which the interested canvasser placed on Mr. Halpine’s wire, to see if none of McLeod’s or Herrick’s ballots had not been placed there; nor did he count them.
There were also other irregularities. It was found that the number of ballots taken from the box exceeded that of. the poll list, and McLeod’s ballots were destroyed to make them correspond.
This interested canvasser also, after he had announced the result of the canvass, made, as stated, destroyed, against the protest of the bystanders and of his associate, the Assembly ballots, though he had *442 carefully gathered up and redeposited, in their respective boxes, the ballots, after counting them, of the other officers.
The interest of this canvass, adverse to the contestants, and the manner in which the pretended counting of the ballots was made, and the disposition made of the other ballots,Torces the conclusion, that he .destroyed .the Assembly ballots in order to cover and to make a fraudulent canvass of the Assembly votesr
Your committee, therefore, think that the contestant has conclusively shown that there was no canvass of the Assembly ballots in this seventeenth district- — -that they were estimated, not counted, and that, too, under circumstances that render the inference of fraud conclusive, and that the Assembly vote in this district should be rejected.
2d. The evidence of illegal voting, by repeaters, in this Assembly district, at the last general election, is overwhelming. It is conclusively shown, by the testimony of numerous witnesses examined by your committee, that gangs of these repeaters, on the day of election, were traveling from polling place to polling place, and many of them are proven to have voted. These repeaters are shown to have come from adjoining districts, in -gangs of twenty-five or thirty, prepared' with lists of names and residences furnished by their leaders, on which to vote, and are shown to have voted from one to eight times each in this district. At one polling place, thirteen of these, identified by a republican challenger as residing in a distant part of the city, were allowed to vote,- unchallenged, for fear of personal violence. Twenty-three of these repeaters appeared before the committee and testified to the casting, by them, of eighty-two ballots in the 'aggregate for the sitting member.
The fact that there are seventeen polling places in this district will give some idea of the facilities afforded for the operations of repeaters, some of whom swear that they voted three times each at the same polling place.
One witness testified that he saw twenty-five or thirty of them start out to vote from one house, and saw their lists of over two hundred names and residences, from which they voted saw them when they returned, and heard them state the places they had voted in the sixteenth ward. ■
A captain of the police, whose precinct is in the sixteenth ward, testified that the ISTinteenth street gang were many of them personally known to him, that they were professional thieves, burglars, pickpockets and highway robbers; that they were repeaters acting in the *443 interest of the democratic party at elections. It is shown that they were employed by, and used their influence in favor of, the “straight democratic ticket.” ' , .
The contestant appeared as a witness and testified that neither by direct "or indirect means did he employ any of these repeaters in any manner whatever to vote or testify, or in any way to aid his election.
The sitting member, from the respect due to his position, was not examined by your committee in reference to the matter of repeating, though he testified as to other matters.
The fact that the civil magistrates of the city of New York are elected by the dominant party, that this practice of repeating by these violent characters has been reduced to a system, and that it is a crime winked at by those 'whose business it is to arrest it, becomes at this time a matter of the gravest concern to the people of this Stale. Several of these repeaters appeared a second time before your committee, retracting their former testimony and stated that they did so under the threat of a prominent official, that,, in case they refused so to retract, they would be sent to the State prison.
The leader of this gang of repeaters,' after testifying on the part. of the contestant, was arrested at the instance of the partisans and friends of the incumbent and incarcerated in the “ Tombs.” He was subsequently produced as a witness for the incumbent under the custody of officers from the “ Tombs ” and reiterated his former testimony and was dismissed to the custody of the officers, was recalled after the lapse of a few minutes by the incumbent, and testified that the other repeaters were bribed by him to swear falsely in favor of the contestant, but still asserting the truth of his first testimony as before. Again he was recalled by the incumbent, but it being apparent to your.committee that improper influences were being resorted to, they declined to have him testify further. This witness and leader of these repeaters was subsequently released on bail, given by some person unknown to the witness.
Evidence precisely similar to the above was given by others of the gang, all protesting that they retracted through fear. The manner in which these retractions were made forces the conclusion that there is a political power in the city of New York, of sufficient strength and influence to grant immunity from punishment of offenses of this class.
3d. Your committee have examined with care the matter of fraudulent naturalizations, and, to that end, requested the county clerk of *444 New Torlc to furnish a list of names and residences of persons naturalized in this district durin'g the three months prior to the last general election. The request was denied, on the ground that the records had become disarranged by the clerks of the Congressional committee.
The fact, that, during this period, twenty-eight thousand naturalization papers were issued, many under circumstances, to say the leastJ suspicious, and that access to these papers was denied, upon a reason which appeared insufficient,*,makes a strong presumption of fraud.
By the aid of the clerks of the Congressional committee, the names and residences of one thousand eight hundred of these twenty-eight thousand naturalized papers were obtained. One hundred and one were issued to this Assembly district, and of the one hundred and one, fifty were proven to be fraudulent, and on these fraudulent papers it is admitted that twenty-seven votes were cast in this district; eighteen per cent of the papers examined were issued to persons residing or giving names as residents of the district; five thousand naturalization papers were issued to the district, and, by the above estimate, the conclusion is inevitable, that a large proportion were illegal and fraudulent.
It is in evidence that these fraudulent papers were bought openly, and distributed by members of the dominant party in New York, through its agency and in its interest.
It thus appears from this source alone that the incumbent holds his place in the Assembly by virtue of votes cast by repeaters, and by those who voted on these fraudulent papers, and your committee further state that the evidence fully warrants the statement-in figures, as follows:
Professional repeaters. 80
Other repeaters and votes cast by non-residents. 55
Seventeenth district rejected. 78
Fraudulent papers voted on out of the one hundred and one examined. 27
240
Halpine’s majority. 190
McLeod’s majority.:. 50
Your committee, therefore, conclude that the incumbent is not entitled to the seat he occupies in this House, not being elected *445 thereto by the legal voters of his district, and they respectfully recommend the adoption of the following resolution :
Resolved, That Alexander McLeod, is the duly elected member of, Assembly from the thirteenth Assembly district of the city of Mew York, and that he is entitled to the seat now occupied by William Iialpine.
All of which is respectfully submitted.
W. W. HEGEMAH.
1ST. B. SMITH.
W. A. COMAHT.
J. H. SELKKEG.
See testimony accompanying report, pages 1 to 387 inclusive. Assembly Documents, 1869, vol. 9, Ho. 139.
Which was laid on the table and ordered printed immediately.
Minoeity Report Presented.
Assembly Chamber, April 23, 1869.
Mr. Moseley, from the committee on privileges and elections, presented a minority report in the case of the contested seat of Mr. Hal-pine, as follows:
Minority Report .of the Committee on Privileges and Elections, in the Matter of the Election of Wm. Halpine as Member of Assembly from the thirteenth Assembly District of Hew York city, Contested -by Alexander McLeod. '

To the A ssembly:

The undersigned, a minority of the committee on privileges and elections, respectfully reports that he is unable to concur either in the statements or in the conclusion of the majority. Some of these statements are so utterly wanting in proof to sustain them, or are so widely variant from the testimony taken, that the majority, finding it impossible at this late period of the session to read the testimony, must have accepted the extravagant and unwarranted assertions of the contestant’s counsel as facts. They are thus committed to many allegations that .they would scarcely have made upon a more thorough examination of the ease.
It should be borne in mind, in the consideration of this case, that the incumbent has not had a full and equal opportunity to present-his testimony. The testimony for the contestant was not concluded *446 until the 22d of March, and the other duties then pressing upon the members of the committee were so numerous that they closed the testimony for the incumbent against his earnest remonstrance, notwithstanding he had yet a large number of witnesses, and had only had between two and three days for examination of his witnesses. During that short time, however, Mr. Halpine examined over one hundred and fifty witnesses, and he was proceeding, when thus cut short, not only to show the falsity of the vague and ridiculous testimony of the contestant, but to demonstrate in the most conclusive manner the fairness of his own election.
Considerable testimony was taken in respect to the canvass of the votes in the seventeenth election district. No fraud whatever was shown, but the majority are warranted, by the weight of evidence, in finding that the canvass in that district was not made in the manner required by law. If the vote of a district may be thrown out, for mere omissions and irregularities, without any proof of intentional wrong, then the return, from that district may be rejected. Its rejection, however,, would not control the final result. That district gave Mr. Halpine seventy-eight majority, and if it were excluded he would still have one hundred and twelve majority.
It is proved that one person, who slept in an adjoining district, registered and voted for Mr. Halpine from the. stable at which he worked, but that he did not vote from any other place.
One young man swore that he was then under agej but that he voted for Mr. Halpine. ' Three cases were presented of persons who voted, in respect to whose naturalization objections, not very well founded, were made.
These are all the cases in. which there is any proof whatever of fraud or wrong. The weakness of the contestant’s case, could alone have induced the majority to such an unheard of cause as objecting to Mr. Ilalpine’s election, because certain persons who are named, are said-to reside in his distinct though some of them were not proved to be residents. If the objection were reasonable, it would be equally tenable against Mr. McLeod; and, if the majority report were sustained, the evidence of these persons would, nevertheless, remain unchanged.
The most important witnesses for the contestant, who had been . hired to testify at from five to ten dollars each, were recalled as witnesses and swore that their previous testimony was false.
Surely all that such men may say amounts to no more than if their *447 testimony was not in the case. If the returns from the seventeenth district were rejected, and every vote were thrown out whether proved or not, to have been for Mr. Halpine, in which it is shown that there was any doubt of the right to vote, Mr. Halpine would yet have one hundred majority. The undersigned therefore recommend the adoption of the following resolution:
Hesolvecl, That Alexander McLeod is not entitled to the office of member of Assembly from the thirteenth Assembly district of the city of Hew York, now held by Hon. William Halpine.
AH of which is respectfully submitted.
WILLIAM W. MOSELEY.
Assembly Document, 1869, vol. 10, Ho. 188.
Which was laid on the table and ordered printed.
Assembly Journal, 1869, vol. 2, page 1440.
RepoRts Considered.
Assembly Chambee, April 23, 1869.
Mr. Hegeman called for the consideration of the report of the committee on privileges and elections in the case of the contested seat of William Halpine.
Mr. Hitchman raised the point of order, that the House being in the order of the third reading of hills, under the ninth joint rule, the consideration of said report required unanimous consent.
Mr. Speaker decided the point of order not well taken, it being a privileged report.
The question being on the adoption of the report.
Mr. Kiernan moved to lay said report on the table.
Mr. Speaker put the question, whether the House would agree to the said motion, and it was determined in the negative. Ayes 52. Hoes 61.
Debate arising.
Mr. Husted moved the previous question.
Mr. Speaker having decided that he had recognized Mr. Husted,
Mr. Hitchman appealed from the decision of the chair.
Mr. Speaker put the question, “Shall the decision of the chair stand as the judgment of the House ? ” and it was determined in the affirmative. Ayes 65. Hoes 3.
Mr. Speaker then put the question, “ Shall the main question be now-put?” and it was determined in the affirmative.
*448 Mr. Speaker, put the question, whether the House would agree to said report, and it. was determined in the affirmative.
Ayes, 66. Noes, 4.
Me. McLeOD DECLARED ENTITLED TO HIS SEAT. v
Mr. Alexander McLeod was then declared entitled to the seat, occupied, by William Halpine, from the thirteenth Assembly district of New York.
The hour of two o’clock having arrived, the House took a recess until four o’clock, p. M.
Four o’clock p. m., the House again met.
Me. MoLeOD TAKES THE OATH OF OFFICE.
Mr. AlexanderMcLeod appeared at the bar of the House and took the constitutional oath of office as member of Assembly. '
Assembly Journal, 1869, vol. 2, pages 1460 to 1466.